Mr. Kozlikowski. Good morning, your honors. I'm Lou Kozlikowski and present the appellant Baltimore Gas and Electric. In full disclosure, I did bring a note from my doctor. I have the common cold as opposed to anything else. This appeal is about maintaining the uniformity of federal maritime law and its application to all users of the Chesapeake Bay and its tributaries. BG&E contends that the limits of federal maritime law govern torts are well established in federal case law and provide for uniform treatment of users of commercial and recreational vessels whenever located on navigable waters. The trial court and appellees contend that state law should apply in discrete areas of the Chesapeake Bay where waters are shallow or surrounded by residential neighborhoods. Such disruption of uniformity would create unnecessarily complex and unwarranted restrictions upon the federal court's exercise of Here, Coastline used its vessel to tow or push a barge from Stony Creek into Eli Cove. Once there, Coastline was to excavate portions of the bottom of Eli Cove and install new pilings to extend an existing residential pier. Sometime was installed pursuant to a Corps of Engineers permit. The lower court found that the tort did not occur in navigable waters of the United States and that the incident did not have a commercial connection to maritime activity. So counsel, we've read the briefs and understand your arguments about how the So assume you're right, the district court's errors, you got it wrong there. You still have the burden of showing that this area was navigable and as I understand that test, it's that it's a water for which commerce can be done in a way that affects interstate, that can be done between the states and the countries. Yeah, assume we agree with you on the errors you think the district court made. What's the basis of saying this particular body meets that test? Well, in the cases that the courts have ruled on, they have ruled that for a series of man-made lakes will be navigable, even though they're used for residential or for pleasure. And so in this case, we have Stony Creek, which adjoins Eli Cove. And Eli Cove is part of the language that's used around the Chesapeake Bay really should be understood. These creeks along the Chesapeake Bay, they call them creeks. They're really inlets. They're tidal inlets and they're fed by creeks. But the whole cove and the creek is inlet on the Chesapeake Bay. It's saltwater and it's tidal. And the bay is almost every inlet up and down the bay is called a creek. And I don't know the people outside of Maryland know that. I'm from Maryland, Your Honor. I mean, this is right at the mouth of the Patapsco River, which is totally tidal. And right across the inlet there is Sparrows Point, which is historically one of the largest industrial areas in the Baltimore area. It had huge ships serving it. And the cove here, the whole thing was served by the barge and all the pilings were served and put in by barges and commercial ships. I don't know what the issue is myself on the navigable water issue. I didn't either, Your Honor, only because what the court found was that you could move from Eli Cove to Stoney Creek to the Patapsco. It's part of the same piece of water. Stoney Cove is an inlet of the Stoney I mean, I have a map right here just to share with my colleagues, but to me, we're talking about walking around the corner in the cove to the cove from the inlet. It's like a bay is part of the ocean. This is all the same water. It's just got a name there. It's five feet deep. But barges do go in commercially and do commercial work. And the cable is there and the cable was put in commercially. All the piers and the pilings were put in commercially. And coastal, in this case, was in there, right? Yes, Your Honor. In addition to what Judge Niemeyer says, the actual map that has the five feet, you can't read it in the version in the JA, but when you get the actual version, that's five, I think the court said it was at most five feet. And that five feet, isn't it actually the average low tide? That's what it would appear to be in that particular chart. It says soundings in feet mean low soundings in feet at mean lower low water. Yes, Your Honor. So that's not the maximum, it's the minimum, or at least on an average basis. That would be correct, Your Honor. Once you determine it's navigable, you do get into the connection test. But even there, I think the court got it wrong because here we had a barge doing work on a piling which caused damage to a submerged cable, just like in Grouper. So in that sense, I think the court was looking at a broader type of an incident and what was really there that ever since Sisson, you're looking at, you put things in terms of generalities as opposed to specifics. I was trying to follow my friend Judge Niemeyer's decision in the Price case, which I thought was very persuasive. And Judge Niemeyer in the Price decision seemed to take a fairly broad view of admiralty jurisdiction, very much like what's present here. That's correct, Your Honor. And so we try to make the circuit law consistent here. Even if it's a shallow water, there can be all sorts of disruptions to maritime commerce in shallow waters. There are gas pipelines and fiber optic cables and all kinds of things that are laid down. And there's the commercial activities. And in fact, BGE was engaged in one in this very case. Yes, Your Honor. Going back to the interruption, if you look at Foremost, which is also cited by Judge Niemeyer in Price, once you have an incident, you then move it to the largest or most largest true affair, and in the Foremost case, they move it to the largest true affair. The case that we have here from the Army designated the cable itself, didn't it as a structure in and affecting the navigable waters? Yes, Your Honor. Then if there was, the Coast Guard would be called to, and there were major incidents arising out of this, would people in peril be within the jurisdiction of the Coast Guard to come and attend to it? Yes, Your Honor. So it's a multi-factor test kind of when you look at it all together. There are no barriers separating the creek, the cove from the creek or whatever. It's kind of a continuous business, isn't it? Yes, Your Honor. It's not like Alford where they put a dam on a perfectly navigable river. But do we need to, the permit is one of the things talked about, and do we need to rely on the permit? Isn't Judge Niemeyer's point that we really don't have barriers here? It's all part of a title situation. And under the Alford test in Price, it seems to meet that. I mean, the permit, yeah, I worry a little bit because it's talking about waters of the U.S. rather than, I'm not sure those are one and the same. So, I mean, my point is not to necessarily challenge your disagreements, but to suggest the permit... It's not conclusive, Your Honor. It's not conclusive. It was just one of the incidents of showing that it was navigable. I hear you. Okay, thank you. I think the court or the panel has asked the right questions. And basically, you know, what's at stake here is, as Judge Niemeyer has pointed out, are you, you know, is the court supposed to change or challenge each inlet, each creek on the Chesapeake Bay, and then go into whether it has the proper depth, whether or not it has, you know, percentage of residential versus commercial? The court at some point ignores the very nature of the Chesapeake Bay and its tributaries. That would be correct, Your Honor. We have to do that. As an aside, my argument about we didn't get a hearing and didn't have a discovery goes to that point because if that's what we're going to do, is look at each creek and each tributary of the Chesapeake Bay, and by definition, you almost have to try that... That's not a good thing. I'm not suggesting... Judicial jurisdictional rules shouldn't be litigable or the subject of extended litigation. And if we have to go creek by creek and cove by cove and everything without some kind of strong presumption, we're going to have a threshold issue with incidents of this nature that's going to just delay the resolution of the case. Anyway, I just... I thought our earlier decision, the judge's earlier decision in Price, for me, just, you know, speaking personally, laid a good groundwork for me. Thank you, Your Honors. Unless you have any other further questions. Paul, do you have any? No, I have no questions. All right, thank you. May it please the court, my name is Louis Long. I represent Coastline Construction in this case, together with Mr. Brown, who represents the landowner parties involved in the case. We're going to be splitting our argument time and also dividing the issues. I'm going to be addressing the maritime connection or nexus aspect of the test for maritime admiralty jurisdiction. And also, I'll address the procedural aspects that were... What do you think about the point about that we're getting sucked into a quagmire here where we're going to have to examine the physical characteristics of every cove and we're going to have to take a sounding and see whether it's five feet deep or four and a half feet deep. And, you know, how many piers there are and how close, you know, how close to another body of water it is. And we're going to develop this gigantic body of jurisdictional law, of admiralty jurisdictional law before people can even get to the merits. That's not a good way to go, is it? I respectfully disagree, your honor. The problem with the approach that you just outlined is that the ankle bone is connected to the shin bones, connected to the leg bone, is connected to the hip bone. And if we extend a determination about admiralty jurisdiction and particularly navigability, which is Mr. Brown's part of the case, but since you posed the question, I'll take a crack at answering it. If you extend a broad proposition, no one is going to debate that the Chesapeake Bay is a navigable waterway, but somewhere out there remotely is a small body of water, a puddle that is connected. It's connected to larger bodies of water and there are no impediments or lines. There's nothing separating them. The cove is part of the creek, which is really not a creek. It's an inlet. And the inlet is part of the Chesapeake Bay. I respectfully disagree, your honor. I've got a map here, but I know the area well. But you can disagree. There is a creek that feeds it at the very end. That is true. But the cove, the creek and the cove are tide waters and there are piers on them with pilings. All the residential properties have pilings and piers, all of which were put in commercially. There's no indication in the record to substantiate that. Let me just finish this. And your vessel was in there as a commercial vessel, was it not? Our vessel was in the water, correct. And it seems to me that that is a perfect indication of navigable water. It's the mean high tide is the test. And I don't know why your vessel itself isn't a conclusive proof that this is navigable water. Well, if we adopt that position, Judge Niemeyer, we've narrowed down the test for navigability from four or five elements that the case law has established to one. And it becomes a self-fulfilling prophecy that if the vessel is in the water, therefore it must be navigable. And that's not what the test is. Well, what's the test that says your vessel was not on navigable water? What's navigable means? It can move in the water. It uses the water as a highway of commerce. There was no highway here. This was a dead end. It's a highway in the sense that the barge went in there and it went in there with a motor driving it. And it was doing a commercial purpose. The cable was put in there. The piers were put in there. And this is part of the Chesapeake Bay. It is the same water. And it's tidal water. I respectfully disagree. And Mr. Brown will elaborate upon that aspect when he has the opportunity to address the court. There was no disruptive impact here on any maritime activity. There was no response from the Coast Guard or any other water-borne... What if it exploded? What would have happened? If that was a gas line instead of an electric line, a gas line went in and it exploded. But it wasn't... Just a minute, this is a potential. Now, the question is, what response would have occurred? In this particular instance, the response came from land. Can you respond to my question? A gas line is interrupted and explodes. And a gas line that's underwater. Who's going to respond to that? Well, in that hypothetical situation, which is not the facts of this case, a response could come from water. But counsel, it's not... You seem to be thinking our test is the facts of the case. And it seems like the case law requires us to look... We're not just posing hypotheticals for the sake of posing them. Doesn't the case law use the word potential? It does use the word potential, but it also uses the words that it can't be fanciful. And I'm going to add a word. It shouldn't be speculative. And that's all that BGE has presented here. Why isn't an underwater... I mean, looking at the facts of this case, we know that the barge damaged an underground cable. And so, it doesn't seem... I mean, so even the facts of this case, if we limit it to it, talk about how an underground cable could be damaged. And it seems like that takes it past just mere speculation to suggest that the potential of a cable could be to do the type of thing Judge Niemeyer's question suggests. I mean, I know we can't speculate on just things that are wild and fanciful, but, I mean, here we got a barge in there. Here we got a disruption or damage to a cable. Are we really speculating and that's what we're talking about? I think we are, because this was not an incident that had any impact at all on any maritime activity in any other body of water to which Eli Cove is connected, either directly or through a series of steps. There was no disruption of any of the marina activities that were out on the... That doesn't respond to Judge Quattlebaum's point about the need to... You say there was no disruption, but it seems to me Judge Quattlebaum was right when he said, we have to look at potential. We can't wait for the disruption to occur. I agree that you look at potential, but potential needs to be informed by the reality. The reality here was that there was no impact on Stoney Creek, no impact on the Patapsco River, no impact on the Chesapeake Bay, and certainly no impact upon the Atlantic Ocean. It sounds to me like the way you're suggesting potential is connected to reality eliminates potential. No, I believe it informs potential. And there was no proof of any commercial activity other than this allegation in the complaint that the barge was in Eli Cove... The barge was commercial, right? The barge was commercial, but just putting a... And wasn't it engaged in commercial activity, driving piles? I don't believe the pile driving had actually gotten started, but that's what the... I thought the pile hit the cable. Maybe I'm wrong. I believe the vermin of the complaint, which is the only evidence before the court at this point, was that Coastline was pushing the barge at the time of impact. Why wouldn't extending the pier be a commercial activity? Extending the pier into the water, if you extend a structure into water, I mean, commercial activity, Coastline's getting paid for it. It was a purely recreational pier, Your Honor, for recreational boating. But is the end... That may be true, and I appreciate your point. So when we look at that, do you look at the end user's use, or do we look at the fact that there's commercial activity that's going to create a pier that then may be used for recreational... I mean, the pier doesn't have to end up being for a business. It seems to me for there to be commercial activity in constructing or adding to it. Maybe I'm wrong there. Maybe you got authority that says what we look to is how the end user is going to use the pier. But it would seem to me the construction has a commercial element to it. I agree with Your Honor that that is our weakest point in the argument. But it certainly is not the only point in the argument. And even if the court were to accept the proposition that this was commercial activity, it still does not have disruptive impact upon or potential for disruptive impact, nor does it meet the... I despair the Supreme Court's case on that issue, the Gruber case. I believe this case is distinguishable from Gruber, Your Honor, because, first of all, in Gruber, the incident was in the Chicago River, which is... I'm talking about the effect on commerce. There, the piling hit an underground freight tunnel. Yes, that's correct. And the court had no trouble saying that that was involved. But that case also required immediate response, which came via the water. This case did not require immediate response. And the response that did eventually come didn't come via the water. If I may, in the very brief moments that I have left, I'd like to address the procedural aspects raised by opposing counsel. BGE had the burden of proof here. It chose to rest on documentary evidence and one affidavit. It took no discovery. It never attempted to take discovery. It made no record of what discovery would, could, should have been taken. And for those reasons, I'd submit that there was no procedural violation and the district court did not abuse its discretion in not extending any further procedural aspects here. Thank you. Thank you. And we'd now like to hear from Mr. Brown. Good morning, and may it please the court. Mark Brown, here on behalf of the homeowners, Raymond Bostic and Candace Bateman. Based on some of the comments from the court a few moments ago, I think we maybe should look at this from a different angle. Look at what BGE's intent was when they laid 35 years ago this cable. Was it BGE's intent to lay this cable in A, navigable waters, where there would be commerce? I think the answer there is no. They didn't intend there to be commercial boats that would be traveling over this. Well, how did all the pilings get set in the cove? As far as the pilings that were put up for the residential areas, certainly there was. I understand that it's not residential. When you put in pilings and somebody puts them in with a barge and they're paid for, that's commercial activity. Those pilings didn't get there by natural growth. You're correct, Your Honor. But the question then would be, was BGE wanting this underlying 13,000 amperage cable to be in a navigable water? I think the answer there is no. They did not want commercial vessels to damage this cable. Sounds like the angle you asked us to look at this is that rather than look at the waterway as it is now and assess whether it's commercial, we're supposed to look at BGE's intent some 30 years ago? I'm not sure where the authority is to analyze navigable waters in that way. The court has indicated that it has found, based upon other decisions, that the Chesapeake Bay, pretty much any area within the Chesapeake Bay, would be a navigable water. What's wrong with that? The Chesapeake Bay is one of the most navigated waters on the East Coast. And for the vast majority of the Chesapeake Bay, that may in fact be the case. But as you get smaller and smaller into the Chesapeake Bay, you don't have the situation where you have the waters being navigable. You do have commercial... Counselor, I'm sorry. No, that's okay. I mean, let's assume we're out in the Chesapeake Bay outside of these little inlets that go in. There's parts of the bay itself that get very shallow. I mean, you could go into something that no one would be quarreling about. It seems like that test would mean that parts of the waters, just because you wouldn't go... Yeah, you might not at low tide take a barge in on that. It seems like that. I'm just having trouble how that test works. I understand, your honor. One of the cases that deals most with navigable waters and of course commercial activity is the Mullinex case, which then in fact did cite the price. And that case said specifically, you have to look at the water's capability to bear commercial navigation. So if we look at this code, does that water have the ability to bear commercial navigation? I believe it doesn't have the ability to. It did in this case. Because it had a barge that was pushing... Commercial, isn't it? ...to put in more piers. You don't think that was commercial? Well, what the Mullinex case went on to say was that it's activity that's conducted in the customary mode of trade and travel. Yes, it was there to put in these piers. But is that customary trade? I would suggest it's not. That's not trade between states. That's not trade between other countries. That's something that's being done to the land for all practical purposes via the water. And when those piers are put in to extend the land into the water, that's not something that you need interstate commerce for. That's not something that you need commerce between the states. You need the ability to get there. You could do that from land, but it would be far more difficult than floating a barge, putting in a piling, and going back out. What you don't have is a situation where commerce is being exchanged, where there's people transferring boats of material that you want to carry things back and forth. That's what admiralty law was used for. Two ways to look at this. One is, and it seems like our case law, kind of following up, I think, on what Judge Niemeyer's earliest questions were, is that this is really all, it's not like this is all one body of tidal water. And sure, on the map you'd see Eli Cove, but it's not like there's a barrier. I mean, you just name these coves. The fact that someone lets to put something on a map doesn't mean it's no longer part of the same body. That's one way we could look at it. It seems like you want us to say no, and if that's the case, it seems like it's connected to Chesapeake Bay and the creeks that are clearly navigable and you can't win there. It seems like for you to win, we must call this a separate body of water and ignore its connection to the other parts of the Bay. We don't have to ignore the fact that you can get from point A to point B, but the question is, once you get to that point B, which is Eli Cove, are you there because houses are there on either side and they're building piers in order to get their recreational vehicles into the water, or are they there because of some commerce that's going to go on? So if we were in the Chesapeake Bay proper, and I don't know it like y'all Marylanders do and Judge Niemeyer does, but at least hypothetically, I would think there could be areas that have residential parks somewhere in an undisputably navigable body, and if an incident happened because that particular incident might have been doing something that was affected a residence versus a business, I don't think that would mean we're not in navigable waters. Well, that's why I believe the district court here in this case used what might be considered a totality of the circumstances set of facts. Each individual fact you could find some way or another might fit into an advocacy law, but when you look at it as a whole, you look at Eli Cove, what was the intent to be done there? What is a reasonable use of Eli Cove? That is not there for amnesty purposes. It's there because folks want to put their boats into the water off of those piers. Can I ask one question real quick? I had asked your colleague that when you look at the map, it I think is the basis of the district court saying that most this was five feet. That's actually false. That five feet is the means low tide depth. That's JA 37, I believe. That was a difficult map to read, but when you do blow it up, there's certainly something that would indicate that the water there would be at five feet. Clearly, it was lower than five feet at other places and higher when you got out to Stony Creek. The map says means low tide, right? If nothing else, the district court is factually wrong in saying the maximum depth is five feet. If you read the map in that way, I think the court is correct. Thank you, sir. Thank you, Your Honor. Mr. Kozlukowski, do you have anything further you need to add? I'll try to be brief, Your Honor. What the court and... Maybe I'll ask the panel if they have some questions. That's fine, Your Honor. We have no questions. Thank you, Your Honor. I'd like to come down and greet counsel and move directly into our next case.
judges: J. Harvie Wilkinson III, Paul V. Niemeyer, A. Marvin Quattlebaum Jr.